# EXHIBIT R

Estate of William Quick

# VCF Documentation



September 11th
Victim Compensation Fund

November 5, 2015

LISA QUICK
C/O BETH JABLON
SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO, PC
120 BROADWAY 18TH FLOOR
NEW YORK NY  10271

Dear LISA QUICK:

Your Eligibility Form for the September 11th Victim Compensation Fund ("VCF") has been reviewed.  You submitted an Eligibility Form on behalf of WILLIAM QUICK.  Your claim number is VCF0011141. The Claims Evaluator determined that your Eligibility Form was substantially complete on November 5, 2015.  As stated in the Regulations and on the Eligibility Form, by filing a substantially complete Eligibility Form, the right to file or be a party to a September 11th-related lawsuit on behalf of the decedent and his or her survivors has been waived.  For more information about this topic, please review Frequently Asked Questions ("FAQs") #7.1 - #7.4 on the www.vcf.gov website.

## The Decision on your Claim

The VCF has determined that the decedent meets the eligibility criteria established in the statute and regulations and that you meet the requirements as the Personal Representative of the decedent.  Your claim is eligible based on the decedent's injuries that were found eligible by the first iteration of the September 11th Victim Compensation Fund that operated from 2001 to 2004 ("VCF1").  The decedent has not been found eligible for any additional injuries because the World Trade Center ("WTC") Health Program did not provide any information to the VCF regarding treatment for any certified conditions.

Although the decedent's VCF1 injuries are again eligible under the current VCF, it does not necessarily mean that you are entitled to receive additional compensation on behalf of the decedent.  Because the decedent was previously compensated by VCF1 for some or all of these injuries, you will only receive additional compensation if the decedent suffered losses that were not included in the decedent's VCF1 award.  For example, if the decedent was determined to be disabled from these conditions since receiving the VCF1 award and that award did not include future lost earnings, you may be eligible for that loss now.  For more information regarding the ability to participate in the VCF after submitting a claim in VCF1, please see FAQ #2.12 on the VCF website.

## What Happens Next

**If you believe the decedent had additional eligible injuries not compensated under VCF1** and you would like the VCF to consider those injuries before calculating the amount of any compensation, you should amend your claim.  If you choose to amend your claim, you will need to use the VCF Private Physician process.  The Private Physician process is a way for the VCF to gather the required information about the decedent's treatment in order to process your claim.



September 11th
Victim Compensation Fund

All forms are available on the VCF website under "Forms and Resources."  The website also includes detailed information and instructions on the Private Physician process.

**If the decedent did not have injuries other than those found eligible under VCF1** and at least one of those injuries substantially worsened resulting in damages or loss that was not compensated in VCF1, you should submit your Compensation Form and required supporting materials.  If you have already submitted your Compensation Form, you do not need to take any action at this time unless contacted again by the VCF.

**Please remember all information and materials must be submitted to the VCF by October 3, 2016.**

If you have questions about the information in this letter or the claims process in general, please call our toll-free Helpline at 1-855-885-1555.  For the hearing impaired, please call 1-855-885-1558 (TDD).  If you are calling from outside the United States, please call 1-202-514-1100.   Every effort will be made to respond to your inquiries as soon as possible.


Sincerely,

Sheila L. Birnbaum
Special Master
September 11th Victim Compensation Fund



September 11th
Victim Compensation Fund

June 14, 2018

LISA QUICK
C/O WENDELL TONG
SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO, PC
120 BROADWAY 18TH FLOOR
NEW YORK NY  10271

Dear LISA QUICK:

The September 11th Victim Compensation Fund ("VCF") has reviewed your claim for
compensation.  Your claim number is VCF0011141.  Your Compensation Form was
determined to be substantially complete on May 14, 2018.  This means your claim was
deemed "filed" for purposes of section 405(b)(3) of the Statute on that date.

Based on the information you submitted, the VCF has calculated the amount of your eligible
loss as **$615,762.66**.  This determination is in accordance with the requirements of the
Reauthorized Zadroga Act.  The enclosed "Award Detail" includes a detailed explanation of
the calculation and a list of the eligible conditions included in this determination.

In making this determination, the VCF considered the $513,181.00 award Mr. Quick received
from the first VCF ("VCF1"). The calculation of the current award takes into account Mr. Quick's
VCF1 non-economic loss award.

Per VCF policy, past replacement services were not awarded; as noted in VCF regulations,
replacement services are typically considered to be a component of loss in claims where the
victim did not have prior earned income or only worked part-time outside the home.  See 28
C.F.R. 104.45(c).

No non-routine legal service expenses are approved for reimbursement for this claim.

As the Personal Representative, you are required to distribute any payment received from the
VCF on behalf of the victim to the eligible survivors or other recipients in accordance with the
applicable state law or any applicable ruling made by a court of competent jurisdiction or as
provided by the Special Master.

**What Happens Next**

The VCF will deem this award to be final and will begin processing the payment on your
claim unless you complete and return the enclosed Compensation Appeal Request Form
within **30 days from the date of this letter** as explained below.  If you do not appeal, the
Special Master will authorize the payment on your claim within 20 days of the end of the 30-
day appeal period.  Once the Special Master has authorized the payment, it may take up to
three weeks for the United States Treasury to disburse the money into the bank account
designated on the VCF ACH Payment Information Form or other payment authorization
document you submitted to the VCF.



September 11th
Victim Compensation Fund

- **Appealing the Award**:  You may request a hearing before the Special Master or her designee if you believe the amount of your award was erroneously calculated or if you believe you can demonstrate extraordinary circumstances indicating that the award does not adequately address your claim.  **If you choose to appeal, your payment will not be processed until your appeal has been decided**.

To request a hearing, you must complete and return the enclosed Compensation Appeal Request Form **and** Pre-Hearing Questionnaire no later than **30 calendar days** from the date of this letter.  The VCF will notify you in writing of your scheduled hearing date and time and will provide additional instructions to prepare for your hearing.  If both forms are not submitted with complete information within 30 days, you have waived your right to appeal and we will begin processing your payment.

- **Amending your Claim**: You may amend your claim in the future if your circumstances change and you have new information to provide to the VCF.  For example, you may amend if the WTC Health Program certifies additional physical conditions for treatment, if you have information in support of your claim that was not submitted to the VCF when your award was determined and that you believe would affect the amount of your award, or if you have incurred additional economic loss due to an eligible condition.  The VCF will review the new information and determine if it provides the basis for a revised decision.  Please see the VCF website for additional details on how to amend your claim and the specific circumstances that may be appropriate to request an amendment.

- **Notifying the VCF of new Collateral Source Payments**: You must inform the VCF of any new collateral source payments you receive, or become entitled to receive, such as a change to your disability or survivor benefits, as this may change the amount of your award.  If you notify the VCF within 90 days of learning of the new collateral source payment, your award will not be adjusted to reflect the new entitlement or payment.  If you notify the VCF more than 90 days after learning of the new or revised entitlement or payment, the VCF may adjust your award to reflect the new payment as an offset, which may result in a lower award.  If you need to notify the VCF of a new collateral source payment, please complete the "Collateral Offset Update Form" found under "Forms and Resources" on the www.vcf.gov website.

Your award was calculated using our published regulations, and I believe it is fair and reasonable under the requirements of the Reauthorized Zadroga Act.  As always, I emphasize that no amount of money can alleviate the losses suffered on September 11, 2001.

If you have any questions, please call our toll-free Helpline at 1-855-885-1555.  For the hearing impaired, please call 1-855-885-1558 (TDD).  If you are calling from outside the United States, please call 1-202-514-1100.

Sincerely,

Rupa Bhattacharyya
Special Master
September 11th Victim Compensation Fund

cc: LISA QUICK


September 11th
Victim Compensation Fund

# Award Detail

Claim Number:      VCF0011141
Decedent Name:    WILLIAM QUICK

| PERSONAL INJURY CLAIM (Losses up to Date of Death) | |
|---|---|
| **Lost Earnings and Benefits** | |
| Loss of Earnings including Benefits and Pension | $0.00 |
| Mitigating or Residual Earnings | $0.00 |
| **Total Lost Earnings and Benefits** | $0.00 |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Disability Pension | $0.00 |
| Social Security Disability Benefits | $0.00 |
| Workers Compensation Disability Benefits | $0.00 |
| Disability Insurance | $0.00 |
| Other Offsets related to Earnings | $0.00 |
| **Total Offsets Applicable to Lost Earnings** | $0.00 |
| | |
| **Total Lost Earnings and Benefits Awarded** | $0.00 |
| | |
| **Other Economic Losses** | |
| Medical Expense Loss | $0.00 |
| Replacement Services | $0.00 |
| **Total Other Economic Losses** | $0.00 |
| | |
| **Total Economic Loss** | $0.00 |
| | |
| **Total Non-Economic Loss** | $0.00 |
| | |
| **Subtotal Award for Personal Injury Claim** | $0.00 |



September 11th
Victim Compensation Fund

| DECEASED CLAIM (Losses from Date of Death) | |
|---|---|
| **Loss of Earnings including Benefits and Pension** | |
| | |
| **Offsets Applicable to Lost Earnings and Benefits** | |
| Survivor Pension | |
| SSA Survivor Benefits | |
| Worker's Compensation Death Benefits | |
| Other Offsets related to Earnings | |
| **Total Offsets Applicable to Loss of Earnings and Benefits** | |
| | |
| **Total Lost Earnings and Benefits Awarded** | $0.00 |
| | |
| **Other Economic Losses** | |
| Replacement Services | $190,142.00 |
| Burial Costs | $14,489.80 |
| **Total Other Economic Losses** | $204,631.80 |
| | |
| **Total Economic Loss** | $204,631.80 |
| | |
| **Non-Economic Loss** | |
| Non-Economic Loss - Decedent | $250,000.00 |
| Non-Economic Loss - Dependent(s) | $300,000.00 |
| **Total Non-Economic Loss** | $550,000.00 |
| | |
| **Additional Offsets** | |
| Social Security Death Benefits | ($255.00) |
| Life Insurance | ($138,614.14) |
| Other Offsets | $0.00 |
| **Total Additional Offsets** | ($138,869.14) |
| | |
| **Subtotal Award for Deceased Claim** | $615,762.66 |



September 11th
Victim Compensation Fund

| Subtotal of Personal Injury and Deceased Claims | $615,762.66 |
|---|---|
| PSOB Offset | $0.00 |
| Prior Lawsuit Settlement Offset | $0.00 |
| Previously Paid Personal Injury Award | $0.00 |
| **TOTAL AWARD** | $615,762.66 |
| | |
| **Factors Underlying Economic Loss Calculation** | |
| Annual Earnings Basis (without benefits) | |
| Percentage of Disability attributed to Eligible Conditions - applicable to Personal Injury losses | |
| Start Date of Loss of Earnings Due to Disability - applicable to Personal Injury losses | |

| Eligible Conditions Considered in Award |
|---|
| VCF1 Eligible Condition |



## U.S. Department of Justice
### September 11th Victim Compensation Fund

P.O. Box 18698
Washington, D.C. 20036-8698

March 3, 2004

WILLIAM  QUICK
C/O MICHAEL A. BARASCH
Barasch, MacGarry, Salzman, Penson and Lim
11 Park Place Suite 1801
New York, NY 10007
USA

RE:  ELIGIBILITY & AWARD DECISION

Dear WILLIAM  QUICK:

A Claims Evaluator has reviewed your application to the September 11th Victim Compensation Fund ("the Fund").  Your claim number is 212-002140.  You indicated on the compensation form that you wished to apply for a Personal Injury award.

### The Eligibility Decision on your Case

On February 6, 2004 your application to receive an award from the Fund was found eligible for the following:

**pulmonary injuries**

The eligibility determination was based upon the information contained in your claim file.

### Your Presumed Award

Based on the information submitted, your claim was found substantially complete on February 6, 2004 and your "presumed award" is **$513,181.00**.  This is comprised of $921,638.00 of economic loss and $125,000.00 of non-economic loss less collateral offsets of $533,457.00.

### What Happens Next

You have two options under the Fund rules:  first, you may accept the presumed award determination and request that payment be issued, or second, you may appeal by requesting a hearing before the Special Master or his designee.  If you request a hearing,



**U.S. Department of Justice**
September 11th Victim Compensation Fund

P.O. Box 18698
Washington, D.C. 20036-8698

the Special Master may alter or modify the award if the presumed award was calculated erroneously or if you demonstrate extraordinary circumstances indicating that the presumed award does not adequately address your claim. There will be no further review after this appeal.

Please complete the enclosed Claimant Presumed Award Decision form and indicate whether you accept the award or would like to request a hearing. **If you wish to appeal, in addition to completing the enclosed form, you must contact the toll-free Helpline to schedule your hearing and complete the pre-hearing questionnaire (copy enclosed).** You can reach the Helpline at 1-888-714-3385, 1-888-560-0844 for the hearing impaired (TDD); from outside the United States, please call collect at 301-519-8739.

Please return the enclosed Claimant Presumed Award Decision form by **March 24, 2004** to the Victim Compensation Fund at the following address.

<u>Via regular mail:</u>

Victim Compensation Fund
P.O. Box 18698
Washington, DC  20036-8698

<u>Via overnight mail:</u>

Victim Compensation Fund
1900 K Street, N.W.
Suite 900
Washington, DC  20006
202-822-4485

If we do not receive your Presumed Award Decision form by March 24, 2004, we will deem this award to be final and will begin processing payment. **Please note that payment cannot be issued until notice of dismissal of any legal action is provided to the Fund.**

I believe that the award calculated using our published regulations is fair and reasonable under the requirements of the Statute. As always, I emphasize that no amount of money can alleviate the losses suffered on September 11.

If you have any questions, please feel free to call your case manager directly or call the toll-free Helpline at 1-888-714-3385, 1-888-560-0844 for the hearing impaired (TDD); from outside the United States, please call collect at 301-519-8739.



## U.S. Department of Justice
September 11th Victim Compensation Fund

P.O. Box 18698
Washington, D.C. 20036-8698

Every effort will be made to respond to your application and/or inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg
Special Master
September 11th Victim Compensation Fund

# Family Member Affidavits

Lisa Quick

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                                    03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

------------------------------------------------------------- X       **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                                 **LISA QUICK**


                                          Plaintiffs,          21-CV-01394 (GBD)(SN)

                      V.

ISLAMIC REPUBLIC OF IRAN,

                                  Defendant.
------------------------------------------------------------- X

STATE OF SOUTH
CAROLINA                         )
                                 : SS
COUNTY OF BEAUFORT  )


        LISA QUICK, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at 5
Newport Drive, Unit 7203, Hilton Head Island, South Carolina 29928.

        2.      I am currently 61 years old, having been born on October 11, 1961.

        3.      I am the wife of Decedent, William Quick, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My husband passed away from pulmonary injuries due to World Trade Center
9/11 Respiratory Syndrome on January 18, 2011, at the age of 55. It was medically determined
that this illness was causally connected to his exposure to the toxins resulting from the September
11, 2001, terrorist attacks at the World Trade Center.

5.      William H. Quick was an FDNY firefighter for over 23 years who devoted his life to saving others. He was a dedicated husband, father, and friend and a man full of life. We would travel with our family to beach islands, go camping, hiking, and scuba diving to list some of our adventures. We built our lives and home together over 30 years where we raised our two children. My husband brought me joy and happiness.

6.      On 9/11, Bill was at home on vacation. When the first tower was attacked, Bill was called to report to his firehouse. He was escorted by NYPD to the World Trade Center towers to assist. Bill worked diligently to help rescue people in hopes of bringing a family peace by saving their loved ones. Bill was within both the North and South tower when they collapsed. Bill continued to work on the pile for 90 days. While working on the pile, Bill injured his left knee which caused him to need surgery. Bill returned to work shortly after his surgery.

7.      Bill's illness started as bronchitis which developed into pneumonia from exposure to the smoke-filled environment. Thereafter, he developed a lingering cough. After an examination, Bill was advised by his doctor that he had glass powder debris within in his lungs from 9/11 and would no longer be able to fulfill his duties as a firefighter. Being forced to stop working as a firefighter was devasting to Bill as it was his passion and led to the onset of depression. Shortly after, Bill was prescribed inhalers, nebulizers, oxygen, and medications for his lung and heart conditions. The sudden onset of illness caused the man who I loved to deteriorate over a ten-year span. We watched as our protector disappeared before our eyes and become just a shell of himself. He could no longer take stairs, walk without assistance, or distances more than 25 feet without him struggling for air and his lips turning blue. Bill was put on an oxygen tank which he needed daily. My husband's health plummeting before us left us with sadness, emptiness, and was an extremely overwhelming experience for my entire family.

8.      Bill's death was extremely brutal. Not only did I lose the love of my life, I also became a single parent in the blink of an eye. Without Bill's income to support our household, I had to work three jobs to be able to facilitate my children's needs and maintain our home. This left very little time for me to care for myself, which led to numerous hospitalizations of my own deriving from the onset of stress and exhaustion. My own health decline prevented me from being with my children as much as they needed me, especially during the loss of their father. I felt alone and abandoned. I still try to comfort myself and my children with the happy memories we once shared with Bill and his strength that we now need to persevere despite his loss and the obstacles we faced as a result.

LISA QUICK

Sworn before me this

5th day of Sept, 2023

Notary public

TENNILLE CORDRAY
Notary Public - State of South Carolina
My Commission Expires
May 25, 2031

Ryan M. Quick

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                                      03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X    **AFFIDAVIT OF**
EVELYN BETSO, et al.,                                              **RYAN M. QUICK**


                                        Plaintiffs,              21-CV-01394 (GBD)(SN)


                        V.

ISLAMIC REPUBLIC OF IRAN,

                                        Defendant.
-------------------------------------------------------------- X

STATE OF NEW YORK        )
                         : SS
COUNTY OF NASSAU         )


        RYAN M. QUICK, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
87 Malone Avenue, East Atlantic Beach, New York 11561.

        2.      I am currently 30 years old, having been born on March 23, 1993.

        3.      I am the daughter of Decedent, William Quick, upon whose death my claim
is based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My father passed away from pulmonary injuries due to World Trade Center 9/11
Respiratory Syndrome on January 18, 2011, at the age of 55. It was medically determined that
this illness was causally connected to his exposure to the toxins resulting from the September 11,
2001, terrorist attacks at the World Trade Center.

5.      My father was a full-time firefighter, truck driver, and father. Firefighting had been his calling since he was a little boy and something that was ingrained into my mind as a child. My father took every opportunity he could to increase his firefighter skills. Whether that was training rookies at multiple fire departments, traveling for mountaineer fire rescue training, running drills at home for us to learn fire safety and emergency drills, or making every volunteer call he could get his hands on. My father was an outstanding fireman with 2 Walter Scott medals, multiple honorary mentions, and too many to count outstanding saves during his firefighter career. My father was a firefighter that never feared risk, always put others first, and was always in the front of the line to lead the pack.

6.      Besides my father being a firefighter, he was an outstanding father carrying two jobs and always being there for my brother and me. I have fond memories of my father taking us camping and teaching us about survival in the wilderness, helping me train for my sports such as running, basketball, softball, and junior lifeguards, making my friends and I laugh till our stomach hurt, teaching me how to surf and read the ocean, and always making the simplicities of life the most memorable. The most memorable thing about my father was his love and loyalty to his wife, kids, family, and friends. My father would do anything in his power to take care of us and demonstrate the best leadership a child could ask for. Without my father I would not be who I am today.

7.      September 11, 2001, was a normal day, and my dad was dropping us off to 3rd grade on his day off. My brother and I said our normal goodbyes. School was odd that day, not that anything had stopped but some of our friends went home early, and the teachers seemed very concerned but attempted to show no emotion to the children. My brother and I took the bus home, but my mom was not there to pick us up, which was out of the ordinary because my mom or dad always picked us up. When we walked through the door my mom was glued to the TV for the news of the World Trade Center. What we discovered when we spoke to my mom was that my father was there when both towers collapsed; more petrifying to think of is that he was less than a block away from the second tower when it came down. After 9/11, we had not seen or heard from my father for three days but knew after the second building had collapsed that my father was still alive because he called one of our neighbors and let him know he was ok as it was the

only number he could remember at the time. That night we went to church and prayed for all the men and women at the Trade Center and father's safe return. I remember seeing my father on that third day with his car basically destroyed with windows blown out, dents all over it, and dust everywhere. My father was full of ashes, debris, and leftover smoke. My father was unrecognizable. After showering and spending the night, he spent all his days until the end of November of 2001 searching for bodies, cleaning up wreckage, and helping all civil service members as much as possible.

8.      After 9/11, my father was never the same. As a kid, I noticed his mood was always different, with a lot of ups and downs. I later learned he had developed anxiety and depression from what he witnessed while working on the pile and it increased due to his insolation in one part of our home because of his obesity from lack of physical activity and his worsening heart condition. His difficulty breathing and heart complications made any physical task exhausting for him. He was unable to use the stairs without constant breaks, developed the inability to even walk more than 20 feet without hyperventilating, he frequently visited hospital and doctors, his lips had turned blue, and he used an oxygen tank 24/7. My father was never afraid of anything, but his fear of dying destroyed him. My father believed he was Superman, and it was Martin Luther King Weekend when my father knew there was something seriously wrong.

9.      On January 18, 2011, my life changed overnight. That day my father looked at me with despair in his eyes and told me his stomach was really bothering him. As a teenager with a sick dad, I did what I could to try to figure out what might've been wrong or how I could help, but the result ended with our usual huge hug and kiss. I would've never thought his stomach pain was a symptom of cardiac arrest and organ failure. That was the last night I ever spoke to my father, that was the last time I hugged and kissed him.

10.     My father passed away during one of my most pivotal moments at the time. I was a high school senior, and I endured the reminder of my senior year mourning the loss of my dad instead of celebrating with him. My father was not able to attend my graduation or assist me through my college education. Trying to attend college without the financial support of both parents, lead to a large amount of student loans and debt thereafter. While attending college, I struggled with the grief of my father, helping my mother to the best of my ability with maintaining

our home and stability, along with keeping our family together.  My father's death left my mother working three jobs to keep our amenities and help my brother and I through school the best she could.  Unfortunately, the additional responsibilities caused my mother to turn to alcohol to cope with my father's death and mental disorders she developed such as anxiety and depression. My brother also developed severe anxiety and depression. My childhood was cut short because I had to become financially responsible and independent at 17 to help the family and obtain a career.

11. My life was flipped upside down when my father passed. My father was my best friend and was unable to see my success as a college athlete, college graduate, and physical therapist. He will not be able to see me walk down the aisle with my future husband due to his passing. 9/11 changed my life and my family's life forever. My father meant everything to us and held our family together. With him gone, I now have to carry that load.

RYAN M. QUICK

Sworn before me this
19 day of Sep., 2023

Connor McKinley

Notary public

CONNOR J. MCKINLEY
Notary Public, State of New Jersey
Commission # 50170902
My Commission Expires 09/09/2026

William H. Quick

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In Re:

TERRORIST ATTACKS ON                                    03-MDL-1570 (GBD)(SN)
SEPTEMBER 11, 2001

-------------------------------------------------------------- X    **AFFIDAVIT OF
EVELYN BETSO, et al.,                                   WILLIAM QUICK**


                                    Plaintiffs,          21-CV-01394 (GBD)(SN)


                        V.

ISLAMIC REPUBLIC OF IRAN,

                                    Defendant.
-------------------------------------------------------------- X

STATE OF NEW YORK        )
                         : SS
COUNTY OF NASSAU         )


        WILLIAM QUICK, being duly sworn, deposes and says:

        1.      I am a plaintiff in the within action, am over 18 years of age, and reside at
87 Malone Avenue, East Atlantic Beach, New York 11561.

        2.      I am currently 30 years old, having been born on March 23, 1993.

        3.      I am the son of Decedent, William Quick, upon whose death my claim is
based, and submit this Affidavit in connection with the present motion for a default
judgment and in support of my solatium claim.

        4.      My father passed away from pulmonary injuries due to World Trade Center 9/11
Respiratory Syndrome on January 18, 2011, at the age of 55. It was medically determined that
this illness was causally connected to his exposure to the toxins resulting from the September 11,
2001, terrorist attacks at the World Trade Center.

5.      My father, William Quick, was a career firefighter for over twenty years who was forced to retire due to debris being found in his lungs after 9/11. My father was my role model and best friend as many others would agree. I remember my dad taking us on trips to visit our grandma in St. Augustine, Florida. I remember that on these trips, my dad would tell us stories about his early upbringing with his biological mom and taught us the value of even the small things in life and the importance of family. Christmas in my household as a child brought me some of the most precious memories. We would take turns opening gifts and when it was my dad's turn, he would take the longest. As a child, it was frustrating and funny, but I later learned that growing up my dad did not receive gifts. This was his way of showing his gratitude.

6.      My dad enjoyed being fully interactive with his children. He would drive us to every practice, event, or even just to our friends' houses. Even after my dad became sick, he would still offer to drive as it was one of the only things he could still do and spend time with us. In the car, my dad taught me most of his lessons and he taught me to shake a man's hand while looking him in the eye, tip the entire bar staff if you win the big Superbowl box and would quote one of his favorite lines from Bronx Tale and tell me "don't waste your talent". These small sayings have stuck with me and molded me into the man I am today.

7.      On 9/11, I was in the third grade, and I remember the day vividly as it changed my family's lives forever. Although it was a sunny day, we were not allowed outside for recess. Our guidance counselor came up to my teacher and whispered in her ear and her face went blank. After school, my mom normally would pick us up from the bus and I remember that she wasn't there. Our neighbor came to get us and when we walked in the house, my mom's eyes were glued to the news on the TV. It displayed what were the Twin Towers engulfed in flames and smoke and when we asked our mom what was going on she simply stated that "bad people attacked a building where Daddy worked and he's okay, but he's working a really big fire." My father was an FDNY

firefighter on 9/11 and after dropping us off at the bus stop and hearing that the first tower was attacked, he reported to the firehouse in Far Rockaway. My dad had still been enroute when the second tower was attacked. When he arrived, he helped evacuate people on the ground floor of the South tower and escaped the tower just as it began to collapse.

8.      Later that evening when we went to church, we learned of the enormity of the situation. When I asked my mom if we would be attacked again, she told me that they had put a shield up to stop us from being attacked again.  My dad came home three days later, covered in dust as well as his car being covered in the same and dented. My dad held us longer than normal that day when he returned and kissed our foreheads. My dad continued to go back to Ground Zero to help with the rescue and recovery until November of 2001. Our family dinners suddenly consisted of our dad explaining to us why he was gone most days and why he was sad since many of his friends died.

9.      I always say we were more fortunate than some of our friends whose dads died on 9/11 and although he grew ill, we had ours for another ten years. However, the man that 9/11 left us with was not the same man who we knew our father to be. 9/11 has taken a physical and mental toll on my father. Prior to 9/11, my dad was a mountain climber, ran the NYC marathon, and was an avid gym goer. I want to say the debris in my dad's lungs had an immediate effect on him. Within the first three years, my dad would become winded after the simplest task which attributed to his weight gain since he was not able to be as active, but also since depression had taken a toll on my dad after witnessing so fellow firefighter of which my dad knew personally died on 9/11. I remember my dad attending funerals for those that died in 9/11 from September 2001 through March 2002. By 2007, my dad was developing what he thought to be bronchitis. He received countless regimens of nebulizer treatments to no avail. By 2009 and 2010, my dad needed oxygen around the clock which made him weak. He needed help going downstairs, which my mother would assist him with so he could greet us after school, and he would not ask for her assistance

again until we went to bed. This was his way of showing his strength although we could visibly see he was worried. Hospital stays became more frequent. On Christmas day of 2010, my dad took off his St. Fluorine necklaces and told us that they protected him during 9/11. He handed each of them to my sister and I and told us never to take it off. My dad passed away three weeks after that and I have never taken my necklace off since.

      10.    My dad's illness turned him into a man that became slower, angry, and depressed. Being a teenager at the time, I could not empathize or understand why my dad had become so angry which caused me to become rebellious and yell back. Looking back, I regret the time that I spent arguing with my dad who had become frustrated by his circumstance and felt cheated by life. I wish I would've cherished what I now know to be the last moments I would spend with him. When my dad died, I felt alone and without guidance. Although we had our disagreements, my dad would still correct my course and knew me better than I know myself. My dad's death caused my mother to also become ill due to stress and develop alcohol dependency to cope with the burden of needing to maintain our home and livelihood. The agony of losing my father also led me into my own depression in which I sought therapy for and although it contributed to the man I am today, there is nothing that I wouldn't give up to have just ten more minutes with my father again.

WILLIAM QUICK

Sworn before me this

4 day of Oct , 2023

Notary public

Gina T. Guma
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01GU4650362
Qualified in Nassau County
Commission Expires January 31, 20 26